

SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re | Case No. 17-01078 |
| HAWAII ISLAND AIR, INC., | Chapter 7 |
| Debtor. | |
| ELIZABETH A. KANE, Bankruptcy Trustee, | Adv. Pro. No. 18-90007 |
| Plaintiff, | Dkt. 68 |
| vs. | |
| ISLAND LEASING, LLC, et al., | |
| Defendants. | |

## MEMORANDUM OF DECISION ON
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Hawaii Island Air, Inc. (the "Debtor") entered into transactions on the eve of

and after its bankruptcy filing, pursuant to which the Debtor shipped certain aircraft

parts, supplies, and tools to defendant AAR Supply Chain Inc. ("AAR") in exchange

for promised payments totaling $1,200,000. AAR paid $800,000 to the Debtor and

the Debtor immediately remitted $400,000 of that amount to defendant Island Leasing, LLC ("Island Leasing"). After the Debtor filed its bankruptcy petition and converted its case to chapter 7, Island Leasing demanded (without informing the chapter 7 trustee) that AAR pay the final installment of $400,000 directly to Island Leasing rather than to the Debtor as AAR's purchase order provided. AAR decided to hold the money. The trustee seeks partial summary judgment on her claims that the payment of $400,000 to Island Leasing was an avoidable preferential transfer and that she is entitled to receive the final $400,000 payment from AAR. Although the trustee's case is plausible, genuine disputes of material fact mostly preclude summary judgment at this time.

I.     FACTS

The material facts are stated in this section. Except for those facts that are specifically described as "disputed," all of the following facts are undisputed and are established for all purposes in this adversary proceeding, without the need for further proof.

Hawaii Island Air, Inc. (the "Debtor"), operated an interisland airline business. Beginning in May 2015, the Debtor operated five ATR airplanes that were owned by defendant Island Leasing, LLC ("Island Leasing") and leased to the Debtor pursuant to certain airplane operating lease agreements.

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 126   Filed  05/07/19   Page 2 of 23

By June 2017, the Debtor had completed a transition to a fleet of Q400 aircraft and had ceased using the ATR aircraft in its operations. The Debtor and Island Leasing began seeking third-party purchasers for the ATR aircraft that Island Leasing owned and certain ATR spare airplane parts that the Debtor owned.

In June 2017, the Debtor advised Paul Marinelli, who was (at all relevant times) president of Island Leasing and (at that time) a director of the Debtor, that the Debtor was experiencing a cash shortage and was not certain that it could meet its June 21 payroll. Mr. Marinelli knew that these statements were true. At that point, neither the Debtor nor Island Leasing had been able to find a third-party purchaser for the ATR aircraft or the ATR spare parts.

The Debtor and Island Leasing executed a document dated as of June 20, 2017, entitled Assignment, Sale, and Transfer of ATR 72-212 Aircraft Spare Parts (the "Assignment"), a true and correct copy of which is located at dkt. 68 at 64-72, which related to certain specified ATR spare parts (the "IL Rotables").

On June 21, 2017, Island Leasing transferred $800,000 to the Debtor in respect of the Assignment.

Island Leasing did not take delivery or possession of the IL Rotables. Instead, they remained in the possession of the Debtor.

There is a dispute about the legal effect of the Assignment. Island Leasing contends that it effected an outright sale of the IL Rotables to Island Leasing,

3

consistent with the form of the Assignment, and that the Debtor remained in possession of the IL Rotables as Island Leasing's bailee. The trustee contends that, in substance, Island Leasing's $800,000 transfer to the Debtor was a loan and that the Assignment created a security interest in the IL Rotables to secure that loan. It is undisputed that Island Leasing did not file a financing statement covering the IL Rotables with the Bureau of Conveyances of the State of Hawaii and did not file any document evidencing the transaction with the Federal Aviation Administration. It is also undisputed that there was no express agreement between the Debtor and Island Leasing creating or stating the terms of a bailment.

In or around July 2017, the Debtor and Island Leasing negotiated a sale of the the IL Rotables and other property not covered by the Assignment (the "HIA Rotables," the "C&E," and the "HIA Tools") to AAR. The transaction was memorialized by a purchase order dated August 15, 2017, and issued by AAR to the Debtor (not Island Leasing).

The total purchase price was $1,200,000, payable in three installments of $400,000 each. The first installment was payable immediately; the second was payable upon shipment; and the third was payable "Net 30 after shipment." The Debtor and Island Leasing agreed that the Debtor would get the first installment payment and that Island Leasing would get the second and third installment payments.

4

Mr. Marinelli, on behalf of Island Leasing, pressed AAR to issue two purchase orders: one to Island Leasing for the IL Rotables with a purchase price of $800,000; and another to the Debtor for the HIA Rotables, the C&E, and the HIA Tools with a purchase price of $400,000. AAR declined to do so. Island Leasing allowed the sale to close anyway.

On August 17, 2019, AAR paid $400,000 to the Debtor, and the Debtor made its first shipment to AAR. At least some of the IL Rotables were included in this shipment; there is a dispute about whether the first shipment also included any of the HIA Rotables, the C&E, or the HIA Tools.

On September 26, 2017, Porter Mackenzie, an employee of the Debtor, notified AAR that the remaining items covered by AAR's purchase order were packed and ready to ship. Mr. Mackenzie and Island Leasing asked AAR to send the remaining $800,000 of the purchase price to Island Leasing. After discussions, AAR refused to do so, stating that it would pay the purchase price to the Debtor in accordance with the purchase order.

On October 10, 2017, Mr. Mackenzie told AAR that the Debtor and Island Leasing has worked out the transaction and were ready to proceed as AAR wished.

On October 12, 2017, Mr. Marinelli sent an email to the Debtor saying that Island Leasing would sell the IL Rotables back to the Debtor, and that the Debtor would pay Island Leasing $800,000 as and when the Debtor received that amount

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 126   Filed  05/07/19   Page 5 of 23

from AAR. Island Leasing sent the Debtor an invoice (dated October 12, 2017, and delivered on October 16, 2017) in that amount. The invoice stated that it was for the sale of aircraft spare parts. There is a dispute concerning whether that transaction was ever consummated.

Also on October 12, 2017, AAR paid the Debtor the second $400,000 installment, and the Debtor deposited the money in its operating account. The next day, the Debtor remitted the same amount to Island Leasing.

On October 16, 2017, the Debtor filed a chapter 11 bankruptcy petition.

On October 16 or 18, 2017, the Debtor shipped more items to AAR. There is a dispute about what, if any, IL Rotables were included in the shipment.

On November 3, 2017, Mr. Mackenzie informed AAR that the Debtor was ready to ship the remaining items covered by AAR's purchase order.

On November 12, 2017, the Debtor moved to convert its chapter 11 case to chapter 7. On November 15, 2017, the court granted the motion and the trustee assumed her duties.

On November 27, 2017, the Debtor (without the trustee's or the court's knowledge or approval) shipped the remaining items covered by the purchase order to AAR. This shipment did not include any IL Rotables.

On November 29, 2017, AAR sent an email to Mr. Mackenzie and Mr. Marinelli stating that it would make the final $400,000 payment to the Debtor during

6

the following week. Mr. Marinelli responded that the Debtor "DID NOT OWN" the parts as they were sold to Island Leasing on June 20, 2017, and said that "the bankruptcy trustee is not likely to simply route the second $400,000 from Island Air to Island Leasing . . . . Therefore, I respectfully request that the $400,000 balance owed on those parts be sent directly to Island Leasing, LLC." Mr. Marinelli did not inform the trustee of this request; the trustee first learned of it (through her counsel) in January 2018.

AAR never paid the final $400,000 installment to anyone.

Neither the trustee nor this court ever authorized the Debtor to undertake any of the postpetition activities with AAR or Island Leasing described in this decision.

## II.   JURISDICTION AND VENUE

The bankruptcy court has jurisdiction over the parties and the subject matter. This is a core proceeding and, in any event, all parties have consented to the entry of final judgment by the bankruptcy court.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[1] The

---

[1] Fed. R. Civ. P. 56(c).

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 126   Filed  05/07/19   Page 7 of 23

moving party has the initial burden of "identifying the portions of the materials on file that it believes show an absence of a genuine issue of material fact."[2]  If the moving party meets its burden, then the opposing party may not defeat a motion for summary judgment in the absence of any significant probative evidence tending to support its legal theory.[3] In a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party.[4]

## IV.    DISCUSSION

### A.    Avoidance of $400,000 Payment

The trustee seeks avoidance of the Debtor's $400,000 payment to Island Leasing as a preferential transfer under section 547. Island Leasing raises multiple objections.

#### 1.    *"Property of the Debtor" and "Antecedent Debt"*

Section 547 permits trustee to avoid a "transfer of an interest of the debtor in property . . . ." The trustee argues that the transaction between Island Leasing and the Debtor was a secured loan in substance, despite its form. Thus, the trustee claims that the IL Rotables and their proceeds still belonged to the Debtor, subject to an

---

[2] *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

[3] *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 282 (9th Cir. 1979).

[4] *State Farm Fire & Cas. Co. v. Martin*, 872 F.2d 319, 320 (9th Cir. 1989).

8

unperfected security interest in favor of Island Leasing. On the other hand, Island Leasing contends that it bought the IL Rotables outright pursuant to the Assignment and that the proceeds of the IL Rotables were never the Debtor's property.

The dispute about the nature of the transaction also pertains to another element of a preferential transfer claim. Under section 547(b)(2), a transfer is not an avoidable preference unless it was "for or on account of an antecedent debt owed by the debtor before such transfer was made . . . ." If the transaction was a sale of the IL Rotables, as Island Leasing contends, then the Debtor did not owe an antecedent debt to Island Leasing. If it was a secured loan in substance, as the trustee contends, then the Debtor's payment of $400,000 was made on account of the preexisting $800,000 loan.

Transactions can create security interests even if their form is otherwise. Article 9 of the Uniform Commercial Code (adopted in Hawaii as Haw. Rev. Stat. § 490:9-101 et seq.)[5] applies to "[a] transaction, regardless of its form, that creates a security

---

[5] The parties seem to agree that Hawaii law governs the question whether the transaction should be treated as a sale or a secured loan. Federal law requires that documents evidencing transfers of aircraft must be filed with the Federal Aviation Administration, but that requirement relates only to the perfection of secured transactions, not whether a particular deal should be treated as a secured transaction or as something else. *Philko Aviation, Inc. v. Shacket*, 462 U.S. 406, 409–10 (1983) (49 U.S.C. § 1403(c) "means that every aircraft transfer must be evidenced by an instrument, and every such instrument must be recorded, before the rights of innocent third parties can be affected. Furthermore, because of these federal requirements, state laws permitting undocumented or unrecorded transfers are preempted . . . ."). If Island Leasing's interest is a security interest, its interest is unperfected whether state or federal law applies, since Island Leasing did not file anything with either the FAA or the Hawaii Bureau of Conveyances.

9

interest in personal property or fixtures by contract . . . ."[6] The official comment

explains that:

> When a security interest is created, this article applies regardless of the form of the transaction or the name that parties have given to it. Likewise, the subjective intention of the parties with respect to the legal characterization of their transaction is irrelevant to whether this Article applies, as it was to the application of former Article 9 under the proper interpretation of former Section 9-102.[7]

The economic substance of the transaction is predominately important:

> Whenever the parties intend their agreement to provide security in the form of personal property or fixtures, their attempt *as such* is (unless covered by a specific statutory exclusion) subject to Article 9. Thus, it is clear that the label applied by the parties to their transaction should not *control* whether the deal is governed by Article 9.[8]

The court must look beyond the label the parties affixed to the deal and the language

they chose to describe it:

> A preeminent theme in . . . Article 9 . . . is that substance governs form. If Article 9 otherwise applies, the parties cannot render it inapplicable merely by casting their arrangement in the language of some particular pre-Code device or in the language of some other transaction such as a lease.[9]

---

[6] Haw. Rev. Stat. § 490:9-109(a)(1).

[7] *Id.* cmt. 2.

[8] 1 PETER F. COOGAN, WILLIAM E. HOGAN, DETLEV F. VAGTS, & JULIAN B. MCDONNELL, SECURED TRANSACTIONS UNDER THE UNIFORM COMMERCIAL CODE § 3.02[2], at 3-8 (2019) (emphasis in original).

[9] 4 JAMES J. WHITE, ROBERT S. SUMMERS, & ROBERT A. HILLMAN, UNIFORM COMMERCIAL CODE 13 (6th ed. 2015).

Island Leasing argues that the court must look to the parties' intentions, that there is a question of fact concerning the intentions of the Debtor and Island Leasing, and that the court must therefore deny summary judgment. To evaluate this argument, one must be clear on what intentions are relevant. The intent to put the transaction in a particular legal pigeonhole–in the words of the official comment, "the subjective intention of the parties with respect to the legal characterization of their transaction"–is irrelevant. Thus, it would not matter much (if at all) if Island Leasing proved that the Debtor and it intended that the transaction would be treated as a sale for legal purposes. But the economic effects and objectives that the parties intended to achieve are relevant. "The question for the court to decide is whether the true nature of the transaction is such that the legal rights and economic consequences of the agreement bear a greater similarity to a financing transaction or to a sale. . . . Parol evidence is admissible to show the true nature of a transaction. The Court should examine the parties' conduct, practices, objectives, business activities and relationships."[10]

The trustee has made a strong case that, in substance, this transaction was a secured loan. The transaction occurred only because the Debtor needed an immediate cash infusion. Island Leasing had no need for the IL Rotables, surely would not have

_____

[10] *In re Evergreen Valley Resort, Inc.*, 23 B.R. 659, 661 (Bankr. D. Me. 1982) (citations and internal quotation marks omitted).

11

bought them if the Debtor had not needed cash to continue its operations, had no interest in them other than liquidating them as rapidly as possible, and apparently was not in the business of dealing in such items. Neither party seemed concerned about whether the IL Rotables were worth $800,000. Island Leasing remitted $800,000 to the Debtor and got repaid that exact amount when the goods were sold. The Debtor remained in possession of the IL Rotables after the transaction and continued to seek a buyer for them, just as it had been doing before the transaction. When the ultimate buyer insisted on transacting the sale with the Debtor rather than Island Leasing, Island Leasing acceded.[11]

It is particularly telling that Island Leasing did not expect or demand payment contemporaneously with the sale of the IL Rotables. Rather, Island Leasing agreed that the Debtor could collect and retain the first $400,000 payment from AAR, even though the first shipment included at least some of the IL Rotables.[12]

On the other hand, there is conflicting evidence about the parties' subjective

---

[11] "The record supports the district court's finding that the transactions were loans. The negotiations on the amount of money advanced concerned Burnett's need for cash rather than the fair market value of his property. The amount accepted was far less than the property's fair market value . . . . These factors unmistakably mark the transactions as loans secured by the property, regardless of whether Burnett was personally liable for the debt." *Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993) (internal quotation marks omitted).

[12] In its responsive concise statement of facts, Island Leasing states that, "The first shipment did not consist entirely of IL Rotables. Some parts that were not owned by Island Leasing were also included in the first shipment." Dkt. 90 at 8.

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 126   Filed  05/07/19   Page 12 of 23

intentions (which is relevant but not determinative)[13] and there are some facts that suggest the transaction was a sale. The Debtor also had no use for the IL Rotables and apparently never intended to repay Island Leasing and regain full control of them. And Island Leasing had no contractual guarantee of repayment.

Given the breadth of the necessary inquiry into "the parties' conduct, practices, objectives, business activities and relationships,"[14] it would be inadvisable to grant summary judgment, particularly where Island Leasing says that it wants to conduct additional discovery. Therefore, partial summary judgment on count I is denied.

### 2. *The PaCap and Carbonview Security Interests*

Island Leasing points out that all or substantially all of the Debtor's assets are encumbered by security interests in favor of Carbonview Limited, LLC ("Carbonview"), an affiliate of Island Leasing, and PaCap Aviation Finance LLC ("PaCap"), and that the claims of Carbonview and PaCap exceed the value of the Debtor's assets. Island Leasing claims there can be no preferential transfer of property

---

[13] The cases cited by Island Leasing in its supplemental memorandum are not to the contrary. *In re Estate Of Damon*, 5 Haw. App. 304, (1984), states that "the intent of the parties is crucial in determining the nature of the transaction at issue as evidenced by" a "purchase agreement option" affecting real estate. The Ninth Circuit quoted this language in *Ryan v. Loui (In re Corey)*, 892 F.2d 829, 837 (9th Cir. 1989). But this case deals with personal property, not real property. The legal standard under article 9 for determining whether a personal property transaction creates a security interest is different from the standard for determining the effect of a document relating to real property. In *Burnett v. Ala Moana Pawn Shop*, 1991 WL 11986116 (D. Haw. 1991), *aff'd and remanded on other grounds*, 3 F.3d 1261 (9th Cir. 1993), the court did state that "the intent of the parties is to be the controlling factor," but it went on to evaluate many other objective aspects of the transaction to ascertain its true nature.

[14] *In re Evergreen Valley Resort, Inc.*, 23 B.R. 659, 661 (Bankr. D. Me. 1982).

13

that is fully encumbered. I disagree.

In the first place, the premise of Island Leasing's argument–that the Debtor's assets and their proceeds were fully encumbered--is not a foregone conclusion. The trustee has not conceded the validity and priority of Carbonview's and PaCap's security interests, and she reserves the right to seek equitable subordination of those security interests. The trustee points out that PaCap and Carbonview expressly consented to the transaction pursuant to which Island Leasing received the $400,000 payment and which is the foundation of Island Leasing's claim to the final $400,000 installment.

In the second place, Island Leasing cites no binding authority on this point. All of the cited opinions are out-of-circuit, and no Ninth Circuit decisions follow those opinions.

In the third place, I disagree with the legal proposition that a transfer of fully encumbered property cannot be a preference. Island Leasing relies on the *Ramba* decision from the Fifth Circuit Court of Appeals.[15] The debtor in *Ramba* agreed to sell the assets of one of its divisions to another company for about $25 million. The debtor's assets were fully encumbered by a bank loan. The bank agreed to release its lien on the assets that the debtor wished to sell, without receiving all of the proceeds: the bank agreed to accept a payment of about $15 million and also agreed to allow the

---

[15] *Cage v. Wyo-Ben, Inc. (In re Ramba, Inc.)*, 437 F.3d 457, 460 (5th Cir. 2006).

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 126   Filed 05/07/19   Page 14 of 23

debtor to use about $10 million of the proceeds to pay vendors who had supplied goods and services to the division that the debtor was selling. The debtor filed a bankruptcy petition a short time later, and the trustee sued to avoid the $10 million payments as preferential transfers. The district court rejected the trustee's claims, and the trustee appealed.

The Fifth Circuit agreed with the district court. It held that, in order for there to be a preference, there must be "a transfer of an interest of the debtor in property." This is plainly correct; section 547(b) says so. The court went on, however, to say that the debtor has no "interest" in fully encumbered property. This statement is incorrect. It cannot be reconciled with the Supreme Court's holding in the seminal *Whiting Pools*[16] decision that encumbered property, even property that a secured creditor seized before the bankruptcy filing, is property of the estate:

> This authorization [to use estate property] extends even to property of the estate in which a creditor has a secured interest. Although Congress might have safeguarded the interests of secured creditors outright by excluding from the estate any property subject to a secured interest, it chose instead to include such property in the estate and to provide secured creditors with "adequate protection" for their interests.[17]

In other words, bankruptcy law distinguishes between the *existence* of an interest in

---

[16] *United States v. Whiting Pools, Inc.*, 462 U.S. 198 (1983).

[17] *Id.* at 203-04. *Whiting Pools* addressed a request for turnover under § 542, but the same logic applies to an action to recover a preference. *In re Lasser*, 68 B.R. 492, 495 (Bankr. E.D.N.Y. 1986); *Air Florida Systems, Inc. v. United States (In re Air Florida Systems, Inc.)*, 50 B.R. 653, 656 (Bankr. S.D. Fla. 1985).

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 126   Filed  05/07/19   Page 15 of 23

property and the *value* of that interest. All property interests of the debtor become property of the estate, even if those interests are worthless.

The *Ramba* court also relied on section 541(d) which provides that, if the debtor holds legal title but not an equitable interest in property on the date of bankruptcy, only the legal title becomes property of the estate. The court reasoned that, if the debtor has no equity in property, section 541(d) excludes that property from the estate. This confuses the economic concept of "equity" in property (the value of ownership after deducting liens) with the legal concept of an "equitable interest" in property ("an interest held by virtue of an equitable title or claimed on equitable grounds, such as the interest held by a trust beneficiary.")[18]

The *Ramba* also stated that preferential transfers are those that "depleted the estate."[19] As a practical matter, this accurately describes most preferential transfers. But it is incorrect to treat "depletion of the estate" as an element that must be proved to establish that a transfer is preferential, because section 547(b) carefully lays out all of those elements, and "depletion of the estate" is not one of the statutorily enumerated elements.

The decision upon which the *Ramba* panel primarily relied, *Maple Mortgage*,[20]

---

[18] Black's Law Dictionary 934 (10th ed. 2014).

[19] 437 F.3d at 460.

[20] *In re Maple Mortgage, Inc.*, 81 F.3d 592, 595 (5th Cir. 1996).

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 126   Filed  05/07/19   Page 16 of 23

stands for a different proposition altogether. The debtor in *Maple Mortgage* was a mortgage loan servicer. It agreed to pay Chase $4.5 million for the right to service a portfolio of mortgages. The debtor, however, had a problem: it had no money. But it found a solution. In connection with the service transfer, Chase transferred about $9.7 million to Maple Mortgage, which represented mortgage payments, escrowed funds, unearned fees, and other items held for the mortgage holders (the servicer's clients). Maple Mortgage immediately used that part of that money–even though the money belonged to the clients, not Maple Mortgage–to pay the $4.5 million purchase price to Chase. Maple Mortgage filed a bankruptcy petition, and its trustee sued Chase to recover the $4.5 million as a preferential transfer. The court of appeals held that the money that Maple Mortgage used to pay that amount did not belong to Maple Mortgage, but instead belonged to the mortgage holders. Therefore, there was no transfer of an interest in the debtor in property, and no preference. *Maple Mortgage* is correct because Maple Mortgage was only a trustee of the money it transferred. In contrast, the debtor in *Ramba* owned the property it transferred, albeit subject to a lien.[21]

 Therefore, partial summary judgment should enter in favor of the trustee

---

[21] Island Leasing quotes two cases stating that, "Any portion of a debtor's property that is unencumbered by mortgage–the equity–is part of the bankrupt's estate." *Snyder v. Dewoskin (In re Mahendra)*, 131 F.3d 750, 755 (8th Cir. 1997); *United States v. Rauer*, 963 F.2d 1332, 1337 (10th Cir. 1992). The quotation is accurate but the courts were not required to decide whether fully encumbered property becomes property of the estate. Therefore, the quoted statements are dicta insofar as the question before me is concerned.

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 126   Filed   05/07/19   Page 17 of 23

determining that the existence of any liens on the subject assets and proceeds is not relevant to the avoidance of the transfer under section 547.

### 3. *Ordinary Course Defense*

Section 547(c)(2) provides that the trustee may not employ the preference power to avoid a transfer:

> to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was–
>
>> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>>
>> (B) made according to ordinary business terms . . . .

The transferee has the burden of proving that this exception applies.[22]

Island Leasing contends that the transaction was a sale, not a loan. But Island Leasing argues in the alternative that, if the court decides that the transaction was a loan, the "ordinary course" exception applies. Island Leasing contends that, when the Debtor experienced an earlier cash shortage in December 2015, the Debtor and Island Leasing entered into an almost identical transaction, except the spare parts were for Q-400 aircraft.

Even a first-time transaction can qualify for "ordinary course" treatment, in the right circumstances.

---

[22] *Wood v. Stratos Prod. Dev., LLC (In re Ahaza Sys., Inc.)*, 482 F.3d 1118, 1128 (9th Cir. 2007).

18

To fulfill § 547(c)(2)(A), a first-time debt must be ordinary in relation to this debtor's and this creditor's past practices when dealing with other, similarly situated parties. Only if a party has never engaged in similar transactions would we consider more generally whether the debt is similar to what we would expect of similarly situated parties, where the debtor is not sliding into bankruptcy. In this latter instance, the fact that a debt is the first of its kind for a party will be relevant but not dispositive.[23]

It is hard to imagine that Island Leasing will be able to establish that this transaction, made on the brink of the Debtor's bankruptcy filing and when both parties knew of the Debtor's extreme financial distress, was ordinary. But Island Leasing has provided enough information–barely–to convince me that there are genuine issues of fact concerning the section 547(c)(2) exception.

## 4.    *Contemporaneous Exchange Defense*

Island Leasing asserts the "contemporaneous exchange" defense of section 547(c)(1). That section precludes preference avoidance of a transfer "to the extent that such transfer was (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange." Island Leasing argues that this defense could apply if (1) the underlying transaction was a sale, as Island Leasing contends, and (2) Island Leasing sold the IL Rotables back to the Debtor, so the Debtor could resell them to AAR. Island Leasing's contention is an extreme example of "arguing in the alternative" because, at this juncture, no one is

---

[23] *Id.* at 1126.

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 126   Filed   05/07/19   Page 19 of 23

arguing that Island Leasing sold the IL Rotables back to the Debtor. (The trustee argues that there was no resale, because there never was a sale in the first place; Island Leasing contends that there was a sale from the Debtor to Island Leasing, and there were discussions about a possible resale from Island Leasing to the Debtor, but the resale never occurred.) Although it is highly unlikely that the contemporaneous exchange exception could apply, it is best to reserve ruling on it until the characterization of the initial transaction is decided. Therefore, summary judgment on this issue should be denied.

### 5. *Bailment*

The trustee argues that she should prevail even if the transaction was a sale followed by a bailment. She contends that Island Leasing's bailment claims are defective in several respects.

Under Hawaii law, a "bailment is a delivery of personal property by one person to another in trust for a specific purpose, with an express or implied contract that the property will be returned or accounted for when the specific purpose has been accomplished or when the bailor reclaims the property."[24]

First, she argues that the true relationship between Island Leasing and the Debtor was that of creditor and debtor, not bailor and bailee. The cases she cites

---

[24] *United Truck Rental Equip. Leasing, Inc. v. Kleenco Corp.*, 84 Haw. 86, 91 (1996).

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 126   Filed 05/07/19   Page 20 of 23

predate the Uniform Commercial Code[25] but remain valid because the UCC did not entirely displace the common law.[26] But the same disputes of fact that preclude summary judgment on the entirety of count I also bar summary judgment on this issue.

Second, the trustee argues that a bailor is not entitled to the proceeds of the bailed property. This assertion is overbroad. The cases cited by the trustee dealt with auctioneers who sold bailed property pursuant to an agreement that permitted them to pay the amount of the net proceeds to the customer/bailor on a deferred basis. Those decisions hold that, under the terms of the operative agreements, the customers were only unsecured creditors of the auctioneers.[27] Other cases hold that, under the right circumstances, a bailment can extend to the proceeds of sale of the bailed property.[28] In this case, there was no express agreement creating or setting the terms of a bailment.

---

[25] *Nua v. Mahelona*, 23 Haw. 702 (1917); *Lopes v. Brito*, 7 Haw. 679 (1889).

[26] Haw. Rev. Stat. § 1-103(b).

[27] *See, e.g., United States v. Lawson*, 925 F.2d 1207, 1210 (9th Cir. 1991) ("When a party is allowed to commingle funds and merely is required to pay the amount of net auction proceeds to the seller, his status is more properly seen as a debtor rather than a bailee."); *Salem v. Lawrence Lynch Corp (In re Farrell & Howard Auctioneers, Inc.)*, 172 B.R. 712, 715-17 (Bankr. D. Mass. 1994); *Franzwa v. Knez Bldg. Material Co. (In re Walker Indus. Auctioneers, Inc.)*, 38 B.R. 8 (Bankr. D. Or. 1983) ("Although the contracts to auction obligated the debtor to pay the amount of net auction proceeds to the defendants, the contracts did not establish that the collected proceeds belonged to defendants or were held for their benefit.").

[28] *See, e.g., In re Taxes, Aiea Dairy Ltd.*, 46 Haw. 292 (1963).

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 126   Filed   05/07/19   Page 21 of 23

But a contract for a bailment can be express or implied.[29] Island Leasing should be allowed to conduct additional discovery to flesh out the terms of the bailment (assuming a bailment existed).

Third, the trustee points out that AAR bought the IL Rotables in a lot sale with the HIA Rotables, the C&E, and the HIA Tools. The trustee argues that this commingling destroys any bailment. Some cases hold that commingling is fatal to a bailment.[30] But Hawaii law is to the contrary.[31]

Therefore, summary judgment should be denied on the issue of the validity of any bailment.

## B.  Entitlement to Final $400,000 Installment

In count II of the complaint, the trustee seeks a declaratory judgment that she is entitled to receive the final $400,000 installment from AAR. This claim hinges on the trustee's contention that the transaction was a secured transaction in substance, and not a sale as its form indicates. Summary judgment on this issue is unwarranted for the same reasons that apply to count I.

---

[29] *Mystic Color Lab, Inc. v. Auctions Worldwide, LLC*, 284 Conn. 408, 419-20, 934 A.2d 227, 235 (2007).

[30] *Id.* at 420.

[31] *In re Taxes, Aiea Dairy, Ltd.*, 46 Haw. 292, 313 (1963) ("The fact of commingling does not preclude the existence of an agency relationship.")

22

## V.    CONCLUSION

The trustee is entitled to partial summary judgment determining that the existence of any liens on the IL Rotables and proceeds is not relevant to the avoidance of the challenged transfer under section 547. In all other respects, the trustee's motion is denied without prejudice.

END OF ORDER

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 126   Filed  05/07/19   Page 23 of 23