

SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re | Case No. 17-01078 |
| | Chapter 7 |
| HAWAII ISLAND AIR, INC., | |
| Debtor. | |
| ELIZABETH A. KANE, Bankruptcy Trustee, | Adv. Pro. No. 18-90007 |
| Plaintiff, | |
| vs. | Related Dkt. No.: 26 |
| ISLAND LEASING, LLC, et al., | |
| Defendants. | |

## <u>MEMORANDUM OF DECISION AFTER TRIAL</u>

Hawaii Island Air, Inc. (the "Debtor") entered into transactions

pursuant to which the Debtor shipped certain aircraft parts, supplies, and tools to defendant AAR Supply Chain Inc. ("AAR") in exchange for promised payments totaling $1,200,000. The Debtor sent the goods to AAR in a series of shipments. AAR made two payments of $400,000 each to the Debtor. The Debtor retained the first payment but immediately remitted the second $400,000 payment to defendant Island Leasing, LLC ("Island Leasing").

The trustee seeks avoidance of the transfer and recovery from Island Leasing. The trustee settled her claims against AAR shortly before trial.

Trial was held on August 13-15, 2019. Post-trial briefs were filed on September 13 and 27, 2019. Nicholas A. Kacprowski, Esq. and Wendy F. Hanakahi, Esq. represented the trustee, and Darryl P. Rains, Esq., Rahman Connelly, Esq. and Christopher J. Muzzi, Esq. represented Island Leasing. This memorandum contains my findings of fact and conclusions of law.

## I.  FINDINGS OF FACT

The Debtor operated an inter-island airline business. During the relevant time period, David Uchiyama was the Debtor's CEO and Jeffrey

U.S. Bankruptcy Court - Hawaii  #18-90007  Dkt # 325  Filed  11/26/19  Page 2 of 39

Au was substantially involved in the Debtor's executive decision-making.

Beginning in May 2015, the Debtor operated five ATR airplanes. Island Leasing owned the ATR aircraft and leased them to the Debtor. The Debtor owned an inventory of rotables, consumable and expendable items, and tooling for the ATR aircraft (the "ATR spare parts").[1]

Island Leasing is an affiliate of a company that was a substantial minority shareholder of the Debtor during the relevant time period. During this same period, Paul Marinelli was the president and sole manager of Island Leasing. He was also a director of the Debtor until at least June 2017 .

In January 2017, the Debtor began taking the ATR aircraft out of service and replacing them with Q400 aircraft that the Debtor leased from Elix Aviation Capital Limited ("Elix"). The transition lasted from January to September 2017. The Debtor took the last ATR aircraft out of service in

_____

"Rotables" are aircraft parts that can be removed from an aircraft, reconditioned, and reinstalled for further use. Consumable and expendable items ("C&E") are used once and then discarded. Screws, O rings, seals, filters, and lubricants are examples of C&E. The tooling in this case consists of tools and equipment that are only used on ATR aircraft.

September 2017.

During the early phase of the transition period, the Debtor and Island Leasing began seeking third-party purchasers for the ATR aircraft that Island Leasing owned and the ATR spare parts that the Debtor owned. The Debtor and Island Leasing negotiated extensively with Elix about a possible sale to Elix of the ATR aircraft and ATR spare parts. Mr. Au, on behalf of the Debtor, took the lead in these negotiations.

By April or May 2017, the Debtor was in financial difficulty. Its revenues were falling, and it began to suffer cash shortages.

In June 2017, the Debtor advised Mr. Marinelli that it was experiencing a cash shortage and was not certain that it could meet its June 21 payroll.  Thus, Mr. Marinelli knew, at that time, that the Debtor was experiencing a cash shortage and that its financial condition was dire. Specifically, the Debtor's vice president of finance told Mr. Uchiyama and Mr. Au that the Debtor was $800,000 short of the cash needed to fund payroll on June 20, and this shortage would continue to increase unless ticket sales improved.

4

At that point, neither the Debtor nor Island Leasing had been able to obtain a third party's commitment to buy the ATR aircraft or the ATR spare parts. Despite this dire situation, Mr. Au was optimistic that Elix would buy the ATR spare parts, either on their own or as a package deal with the ATR aircraft. (Mr. Au was so sure that Elix would buy the ATR spare parts that he even drafted and secured Island Leasing's signature on a purchase and sale agreement. He was shocked when Elix told him, in early July, that Elix would not buy the ATR spare parts.) Mr. Marinelli also thought that the ATR spare parts could be sold for about $800,000, and possibly more, within a few weeks. Mr. Uchiyama was likewise confident that the parts could be sold promptly for $800,000 or more.

The Debtor and Island Leasing executed a document dated as of June 20, 2017, entitled Assignment, Sale, and Transfer of ATR 72-212 Aircraft Spare Parts (the "Assignment").[2] The Assignment provides that the Debtor sold to Island Leasing certain specified ATR spare parts (the "IL Rotables")

---

[2] Trial Ex. P-K 5.

in consideration of a cash payment of $800,000.00. Island Leasing made this payment on June 21. This enabled the Debtor to make payroll.[3]

Island Leasing entered into this transaction because the Debtor was experiencing a cash crunch and faced a very real possibility of an immediate bankruptcy filing. Island Leasing believed that the cash it paid to the Debtor would allow the Debtor time to solve its financial difficulties by finding third-party funding or increasing its revenues during the busy summer tourist season. Island Leasing had no independent need or use for the IL Rotables. It intended to resell the IL Rotables as soon as possible.

The Assignment was not a complete statement of the parties' agreement. In addition, the parties agreed that the Debtor would remain in possession of the IL Rotables, care for them in the Debtor's facilities, continue to seek a buyer for the IL Rotables, and ship the IL Rotables to a buyer once one was found, all at the Debtor's expense. The parties also agreed that, although the Assignment ostensibly made Island Leasing the

---

[3] More precisely, the Debtor's bank had funded payroll on June 20, based on the Debtor's assurance that it would deposit funds to cover the overdraft on June 21. The $800,000 remittance allowed the Debtor to make good on its promise to its bank.

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 325   Filed  11/26/19   Page 6 of 39

absolute owner of the IL Rotables, the Debtor would receive a portion of the sale proceeds in excess of $800,000. The exact split was not agreed upon until later. The Debtor's CEO, Mr. Uchiyama, however, expected that the Debtor would retain all the proceeds in excess of $800,000.

Prior to the execution of the Assignment, the parties did not discuss whether the Debtor would be obligated to reimburse Island Leasing for any shortfall, if the IL Rotables sold for less than $800,000.00. Debtor never agreed to reimburse Island Leasing because no one anticipated a shortfall. Also, at that point, both the Debtor and Island Leasing knew that the Debtor was in a desperate financial condition and could not pay its existing debts or continue to operate for long, absent a substantial capital infusion or a speedy improvement of its declining operating revenues. Because of this, the Debtor would not have been able to make good on any promise to reimburse Island Leasing for a shortfall and Island Leasing knew that any such promise from the Debtor would have been meaningless.

As agreed, Island Leasing did not take delivery or possession of the IL Rotables. Instead, they remained in the possession of the Debtor. The

Debtor continued to store and care for the IL Rotables, in the proper manner, at its own expense. This required the Debtor to keep the IL Rotables in a climate-controlled facility, keep some items on anti-static mats, keep other items in refrigerators, and keep the parts together with the applicable maintenance records.

Island Leasing did not file a financing statement covering the IL Rotables with the Bureau of Conveyances of the State of Hawaii, and it did not file any document evidencing the transaction with the Federal Aviation Administration.

The Debtor continued to seek a buyer for the ATR aircraft, the IL Rotables, and the other ATR spare parts. Island Leasing did not independently search for a buyer, and instead relied entirely on the Debtor's efforts.

In or around July 2017, the Debtor and Island Leasing negotiated a sale to AAR of most of the IL Rotables and the ATR spare parts that were not IL Rotables (the "HIA spare parts"). The transaction was memorialized by a purchase order dated August 9, 2017, and issued by AAR as buyer to

8

the Debtor (not Island Leasing) as seller. AAR's purchase order provided that the Debtor would warrant that it had good title to the HIA spare parts.

The total purchase price was $1,200,000, payable in three installments of $400,000 each. The first installment was payable immediately; the second was payable upon shipment; and the third installment was payable "Net 30 after shipment."

The $1,200,000 purchase price represented the fair market value of the subject property at that time. It was the highest price the Debtor could achieve under the circumstances. No other prospective buyer had offered as much for a bulk purchase of all of the property. The Debtor might have been able to realize more if it had sold the items individually or in smaller lots, perhaps on a consignment basis with a dealer, but there was no guarantee that the total sales proceeds would have been greater. Further, individual or small lot sales would have taken many months to complete, and the Debtor could not afford to wait. In fact, AAR has owned the IL Rotables and the HIA spare parts for about two years; it has not been able to sell all of those items; and the total gross proceeds AAR has realized

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 325   Filed   11/26/19   Page 9 of 39

have been only slightly more than the $1,200,000 price it agreed to pay to the Debtor. The Debtor could not have sold them any faster or for a greater price than AAR, an experienced and reputable dealer in such parts.

The Debtor and Island Leasing agreed that the Debtor would get the first installment payment and that Island Leasing would get the second and third installment payments. While Mr. Marinelli had originally agreed that the Debtor would receive a share of any proceeds in excess of Island Leasing's $800,000 outlay, by the time the AAR transaction was underway, Mr. Marinelli told the Debtor's representatives that Island Leasing only wanted to recoup the $800,000.00 it paid pursuant to the Assignment and that the Debtor should get the first payment to alleviate its continued cash shortages. Mr. Marinelli also thought it would look bad for Island Leasing, an affiliate of the Debtor, to recover more than its $800,000 outlay while the Debtor was unable to pay its other creditors.

Island Leasing contends that it permitted the Debtor to keep the first payment from AAR on account of the HIA spare parts (i.e., the ATR spare parts that were not included in the IL Rotables) and for the expenses it

incurred in storing, maintaining, marketing, and shipping the IL Rotables to AAR. The facts do not support this contention. Island Leasing was prepared to allow the Debtor to keep the lion's share of the surplus proceeds from the anticipated sale to Elix, even though that sale was expected to occur only a few weeks after the Assignment. If the Elix sale had occurred as the parties expected, the Debtor's "services" would have been minimal, and $400,000 would have been a substantial overpayment. Therefore, the split of the AAR proceeds had little if anything to do with the value of the Debtor's ATR spare parts or of any post-Assignment services provided by the Debtor; it had everything to do with repayment of the amount that Island Leasing advanced to the Debtor.

Some of the IL Rotables (i.e., the ATR spare parts that were included in the Assignment) were not included in the sale to AAR. Some of the omitted items had significant value.[4] Based on the values listed in the Assignment, the omitted items represented about nine percent of the total

---

[4] Trial Ex. P-K 82.

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 325   Filed   11/26/19   Page 11 of 39

value of the IL Rotables.[5] It is more likely than not that the Debtor simply installed the omitted items on its ATR aircraft to keep those planes in service, without notifying Island Leasing or obtaining Island Leasing's approval, between June 20 (the date of the Assignment) and September 2017. Island Leasing did nothing to keep track of the IL Rotables in the Debtor's possession after the Assignment, did nothing to prevent the Debtor from using them in the Debtor's operations without accounting or paying for them, and never objected when the Debtor disclosed that it had use some of the IL Rotables and could not sell them to AAR. This is not the type of behavior that one would expect from a true owner of the IL Rotables.

Mr. Marinelli, on behalf of Island Leasing, pressed AAR to issue two purchase orders: one to Island Leasing for the IL Rotables with a purchase

---

[5] The "values" listed in the Assignment do not reflect the then-current market value of any of the IL Rotables. The Debtor made extensive efforts to sell the IL Rotables and no one was willing to pay those amounts for the items. The "values" were probably the amount that the Debtor originally paid for the items, not reduced by depreciation. It is reasonable to infer, however, that the proportion of the fair market value of each item to the total fair market value of all of the items was approximately the same as the proportions of the "values" listed in the Assignment.

U.S. Bankruptcy Court - Hawaii    #18-90007    Dkt # 325    Filed    11/26/19    Page 12 of 39

price of $800,000; and another to the Debtor for the rest of the HIA spare parts with a purchase price of $400,000.  However, AAR declined to do so. This was mostly because AAR wanted to be able to assure its customers that the parts came from an airline or another regulated source (meaning a seller that could properly handle and maintain aircraft parts), and Island Leasing was not such a company.[6] Island Leasing allowed the sale to close with the Debtor as the seller.

On August 17, 2019, AAR paid $400,000 to the Debtor, and the Debtor made its first shipment to AAR. Although the Debtor received and kept the first payment, most (and perhaps virtually all) of the items included in the first shipment were IL Rotables.

On September 26, 2017, Porter Mackenzie, an employee of the Debtor, notified AAR that the remaining items covered by AAR's purchase order were packed and ready to ship. Mr. Mackenzie and Island Leasing asked AAR to send the remaining $800,000 of the purchase price directly to Island Leasing. After discussions, AAR refused to do so, stating that it would pay

---

[6] *See* Trial Ex. P-K 97.

13

the purchase price to the Debtor in accordance with the purchase order.

On October 10, 2017, after a conversation with Mr. Marinelli, Mr. Mackenzie told AAR that the Debtor and Island Leasing had worked out the transaction and were ready to proceed as AAR wished, under the purchase order (i.e., whereby the Debtor was held out as the seller of the IL Rotables and HIA spare parts, with the accompanying seller's warranties). Mr. Mackenzie sent this message with the prior knowledge and approval of Mr. Marinelli. In other words, Island Leasing authorized the Debtor to represent to AAR that the Debtor could transfer ownership of the ATR spare parts, including the IL Rotables, to AAR.

In an email dated October 12, 2017, Mr. Marinelli wrote that, "As discussed with [Mr. Mackenzie] the other day, please proceed with the sale of the parts to AAR under the existing PO." He further wrote that Island Leasing would sell the IL Rotables back to the Debtor, and that the Debtor would then pay Island Leasing $800,000, when the Debtor received that amount from AAR.[7] Island Leasing sent the Debtor an invoice (dated

---

[7] Trial Ex. P-K 41.

14

October 12, 2017, and delivered on October 16, 2017) in that amount. The invoice stated that it was for the "Sale of Aircraft Spare Parts per Exhibit A."[8] The exhibit to the invoice is a copy of the exhibit to the Assignment.

Island Leasing denies that the resale transaction was ever consummated, pointing out that no formal transfer document like the Assignment was executed in connection with the proposed resale. But Mr. Marinelli never contemplated creating a document like the Assignment. In an email dated October 10, he wrote that he was "planning to call [Mr. Mackenzie] today to see if we can simply create a new invoice to [the Debtor], selling the parts back to [the Debtor]."[9] Further, there is no dispute that (1) Island Leasing expressly agreed that the Debtor would act as the seller to AAR and give the seller's warranties, (2) the Debtor agreed to pay Island Leasing $800,000 if and when the Debtor received the AAR sales proceeds, and (3) the Debtor in fact paid $400,00 to Island Leasing in conformity with the agreement.

---

[8] Trial Ex. P-K 86.

[9] Trial Ex. D-IL 2128.

15

On October 12, 2017, AAR paid the Debtor the second $400,000 installment, and the Debtor deposited the money in its operating account. The next day, the Debtor remitted the same amount to Island Leasing.

Island Leasing argues that AAR knew all along that Island Leasing owned the IL Rotables and that it demanded that the Debtor represent its ownership of all of the HIA spare parts, including the IL Rotables, so that AAR could show its customers paperwork that would give them a false sense of comfort. The implication of this argument is that AAR knowingly defrauded its customers. This argument is unpersuasive for at least three reasons.

First, if Island Leasing believed its own argument, it would have made a direct claim against AAR for payment for its IL Rotables. But Island Leasing made no such claim.

Second, if Island Leasing was right and AAR committed fraud, Island Leasing was a willing participant in that fraud: Island Leasing knew what AAR was doing, did nothing to stop it, and indeed facilitated it by authorizing the Debtor to give warranties of title to goods it did not own.

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 325   Filed  11/26/19   Page 16 of 39

Third, the evidence does not support Island Leasing's fraud theory. Instead, the evidence overwhelmingly shows that Island Leasing authorized the Debtor to transfer the IL Rotables to AAR for the purpose of giving AAR title to the IL Rotables.

On October 16, 2017, the Debtor filed a chapter 11 bankruptcy petition.

Also on October 16, 2017, the Debtor shipped more items to AAR via FedEx. The court has entered an order granting partial summary judgment determining that this shipment was a post-petition transfer.[10]

The trustee proved, by a preponderance of the evidence, that the items listed in Trial Ex. P-K 169 as "boxed up and shipped" is a substantially accurate list of the items that the Debtor sent to AAR, after the filing of the bankruptcy petition. The list is not perfect but it is the best list that can be created based on the business records of the Debtor and AAR.[11]

---

[10] Dkt. No. 236.

[11] AAR kept careful records of which items it received from the Debtor and when it entered those items in its inventory tracking system. It did not, however, keep track of when the Debtor shipped those items or when they arrived at AAR's facilities, presumably because those dates were not important for AAR's business purposes.

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 325   Filed 11/26/19   Page 17 of 39

It would be inappropriate and unfair to hold the trustee (and, indirectly, the Debtor's innocent creditors) to a level of precision that exceeds the usual business practices of AAR and the Debtor, especially where Island Leasing did nothing to require the Debtor to keep track of the IL Rotables that Island Leasing claimed to own.

The trustee, however, did not sufficiently prove the value of the items that were shipped after the petition filing. The trustee's proposed valuation relies on a combination of the prices at which AAR resold some of the items (adjusted by any cost AAR incurred to recondition those items) and, for the other items, the cost that AAR allocated to those items in its internal accounting records. AAR's resale price (minus reconditioning costs) does not indicate the value of the items in the Debtor's hands. AAR resold the goods individually or in small lots, at "retail," over a period of time; AAR must have incurred expenses during that time, such as the cost of marketing, storing, and maintaining the property and the time value of the capital tied up in the items that were pending its sale. Using AAR's resale price as the value of the items ignores the expenses that AAR incurred, and

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 325   Filed 11/26/19   Page 18 of 39

that the Debtor would have had to incur, to realize those prices. Further, the Debtor simply could not afford to take the time to do anything other than a bulk sale. AAR's internal cost allocation does not reflect, with any precision, the value of the individual goods. AAR made those allocations to suit its internal objectives and accounting requirements, not necessarily to indicate what any item was actually worth. For example, AAR allocated zero cost to the HIA consumables and expendables ("C&E") because such items were not part of AAR's core business, but AAR was able to resell the C&E very quickly for $180,000.

On November 3, 2017, Mr. Mackenzie informed AAR that the Debtor was ready to ship the remaining items covered by AAR's purchase order.

On November 12, 2017, the Debtor moved to convert its chapter 11 case to chapter 7. On November 15, 2017, the court granted the motion and the trustee, Elizabeth A. Kane, assumed her duties.

On November 27, 2017, the Debtor (without the trustee's or the court's knowledge or approval) shipped the remaining items covered by the purchase order to AAR. This shipment did not include any IL Rotables.

19

On November 29, 2017, AAR sent an email to Mr. Mackenzie and Mr. Marinelli stating that it would make the final $400,000 payment to the Debtor during the following week. Mr. Marinelli responded that the Debtor "DID NOT OWN" the parts as they were sold to Island Leasing on June 20, 2017. (This was inconsistent with the position he took on October 10 and 12, 2017.) He went on to say that "the bankruptcy trustee is not likely to simply route the second $400,000 from Island Air to Island Leasing . . . . Therefore, I respectfully request that the $400,000 balance owed on those parts be sent directly to Island Leasing, LLC." Mr. Marinelli did not inform the trustee of this request; the trustee first learned of it (through her counsel) in January 2018.

AAR did not pay the final $400,000 installment to anyone.

Neither the trustee nor this court ever authorized the Debtor to undertake any of the postpetition activities with AAR or Island Leasing that are described in this decision.

The transaction evidenced by the Assignment was a sale in form but a loan in substance.

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 325   Filed   11/26/19   Page 20 of 39

(1)     After the transaction, the Debtor (with Island Leasing's knowledge and consent) acted as if it were still the owner of the IL Rotables. It stored and maintained them and continued its efforts to sell them (without any assistance from Island Leasing). Most importantly, Island Leasing allowed the Debtor to use the IL Rotables in the ordinary course of the Debtor's business, without making any payment or accounting to Island Leasing. If Island Leasing were the true owner of the IL Rotables, Island Leasing would have taken steps to prevent the Debtor from installing any of the IL Rotables on the Debtor's leased aircraft and using them without payment.

(2)     The transaction occurred only because the Debtor needed an immediate cash infusion. Island Leasing had no need for the IL Rotables, would not have "bought" them if the Debtor had not needed cash to continue its operations, and had no interest in them other than liquidating them as rapidly as possible to recover the funds it advanced to the Debtor. Island Leasing had no reason to become the "owner" of the IL Rotables at that time other than to gain a potential legal advantage in recovering its

advances.[12]

(3)     A true owner of the IL Rotables would have been entitled to all of the sale proceeds of the IL Rotables. But Island Leasing and the Debtor agreed from the outset that, if the IL Rotables sold for more than $800,000, the Debtor would get at least a share of the surplus. Island Leasing claims that the Debtor's share was compensation for its services in maintaining, marketing, and shipping the items and payment for the ATR spare parts that were not included in the IL Rotables, but no one made any effort to put a value on those services or items. In the end, the parties agreed that the Debtor could retain all of the surplus, not because of the value of its services and property , but rather because it needed the cash and Island Leasing thought it would be unseemly to recover more than what it had advanced.

(4)     Island Leasing makes much of the fact that the Debtor never

---

[12] Island Leasing thought that it might be easier to sell the ATR aircraft if it could also sell an inventory of spare parts, but this was a secondary consideration at best; Island Leasing had been trying to sell the aircraft, and the Debtor had been trying to sell the ATR spare parts, for some time, but no buyer had offered or seriously suggested that it would prefer to buy the aircraft and the spare parts in a package deal.

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 325   Filed  11/26/19   Page 22 of 39

agreed to be liable for the shortfall if the IL Rotables were sold for less than $800,000. It is true that the Debtor never expressly agreed to this. But personal liability for the debt is not determinative.[13] Nonrecourse loans, where the creditor only has recourse to its collateral, are loans even though the debtor has no personal liability for repayment.[14] Further, the Debtor's promise of repayment would have been a meaningless gesture: the Debtor could not repay its existing debts, and had little to no hope of repaying an additional debt to Island Leasing.  In any event, the Debtor behaved as if it were obligated to get Island Leasing repaid. The Debtor worked hard to sell the IL Rotables even though there was no certainty that those items could be sold for more than $800,000 and even though the Debtor had no agreement to receive a share of any of the surplus proceeds.

(5)     When AAR insisted on transacting the sale with the Debtor rather than Island Leasing, Island Leasing acceded and authorized the

---

[13] *Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993) (where the court held that a transaction was a loan in substance, even though the borrower was not personally liable for the debt).

[14] *In re Buchferer*, 216 B.R. 332, 339 (Bankr. E.D.N.Y. 1997).

Debtor to act as the seller and to give the corresponding warranties. In other words, Island Leasing wanted to be the owner when it seemed to suit Island Leasing's interests, but was willing to have the Debtor act as the owner when that benefitted Island Leasing.[15]

## II. JURISDICTION AND VENUE

The bankruptcy court has jurisdiction over the parties and the subject matter. This is a core proceeding and, in any event, all of the parties have consented to the entry of final judgment by the bankruptcy court.

## III. CONCLUSIONS OF LAW

### A. Avoidance of the $400,000 Payment

Count I of the trustee's complaint alleges that the Debtor's $400,000 payment to Island Leasing was a preferential transfer under section 547(b). That section provides that the trustee may avoid:

any transfer of an interest of the debtor in property–

(1) to or for the benefit of a creditor;

---

[15] Because I have found that the transaction was a loan and not a sale, I need not evaluate the parties' contentions about whether the Debtor was Island Leasing's bailee after the Assignment was executed.

24

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made--

> (A) on or within 90 days before the date of the filing of the petition; or

> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if--

> (A) the case were a case under chapter 7 of this title;

> (B) the transfer had not been made; and

> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.[16]

Most of these elements are undisputed. Island Leasing does not deny that it was a creditor of the Debtor, that the Debtor was insolvent when it paid Island Leasing, that the timing requirements of subsection (4) are met, or that the "betterment of position" test of subsection (5) is satisfied. Island

---

[16] 11 U.S.C. § 547(b).

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 325   Filed 11/26/19   Page 25 of 39

Leasing does deny, however, that the payment was a "transfer of an interest of the debtor in property" and that it was made on account of an antecedent debt that the Debtor owed to Island Leasing. Island Leasing also asserted certain affirmative defenses.

### 1. *"Property of the Debtor" and "Antecedent Debt"*

Island Leasing contends that it bought the IL Rotables outright pursuant to the Assignment and that the proceeds of the IL Rotables were never the Debtor's property. In contrast, the trustee argues that the transaction between Island Leasing and the Debtor was a secured loan in substance, despite its form. Thus, the trustee claims that the IL Rotables and their proceeds still belonged to the Debtor, subject to an unperfected security interest in favor of Island Leasing.

The dispute about the nature of the transaction also pertains to the "antecedent debt" element of a preferential transfer claim. If the Assignment transaction was a sale of the IL Rotables, as Island Leasing contends, then the Debtor did not owe an antecedent debt to Island Leasing when the IL Rotables were sold to AAR. On the other hand, if the

26

Assignment transaction was a secured loan in substance, as the trustee

contends, then the Debtor's payment of $400,000 was made on account of

the preexisting $800,000 loan.

Transactions can create security interests even if their form is

otherwise. Article 9 of the Uniform Commercial Code (adopted in Hawaii

as Haw. Rev. Stat. § 490:9-101 et seq.)[17] applies to "[a] transaction,

regardless of its form, that creates a security interest in personal property

or fixtures by contract . . . ."[18] The official comment explains that:

> When a security interest is created, this Article applies
> regardless of the form of the transaction or the name that
> parties have given to it. Likewise, the subjective intention of the
> parties with respect to the legal characterization of their
> transaction is irrelevant to whether this Article applies, as it
> was to the application of former Article 9 under the proper
> interpretation of former Section 9-102.[19]

The economic substance of the transaction is predominately important:

> Whenever the parties intend their agreement to provide

---

[17] Hawaii law governs the question whether the transaction should be treated as a sale or a secured loan.

[18] Haw. Rev. Stat. § 490:9-109(a)(1).

[19] *Id*. cmt. 2.

27

security in the form of personal property or fixtures, their attempt *as such* is (unless covered by a specific statutory exclusion) subject to Article 9. Thus, it is clear that the label applied by the parties to their transaction should not *control* whether the deal is governed by Article 9.[20]

The court must look beyond the label the parties affixed to the deal and the language they chose to describe it:

A preeminent theme in . . . Article 9 . . . is that substance governs form. If Article 9 otherwise applies, the parties cannot render it inapplicable merely by casting their arrangement in the language of some particular pre-Code device or in the language of some other transaction such as a lease.[21]

There is no doubt that the parties intended to document the transaction as a sale. But the intent to put a transaction in a particular legal pigeonhole—in the words of the official comment, "the subjective intention of the parties with respect to the legal characterization of their transaction"—is irrelevant. The economic effects and objectives that the parties intended to achieve are relevant. "The question for the court to

---

[20] 1 PETER F. COOGAN, WILLIAM E. HOGAN, DETLEV F. VAGTS, & JULIAN B. MCDONNELL, SECURED TRANSACTIONS UNDER THE UNIFORM COMMERCIAL CODE § 3.02[2], at 3-8 (2019) (emphasis in original).

[21] 4 JAMES J. WHITE, ROBERT S. SUMMERS, & ROBERT A. HILLMAN, UNIFORM COMMERCIAL CODE 13 (6th ed. 2015).

decide is whether the true nature of the transaction is such that the legal rights and economic consequences of the agreement bear a greater similarity to a financing transaction or to a sale. . . . Parol evidence is admissible to show the true nature of a transaction. The Court should examine the parties' conduct, practices, objectives, business activities and relationships."[22]

The parties argue at length about what factors the court should consider. But the official comment and the authorities make it clear that characterizing a transaction as a sale or a loan is a holistic endeavor that cannot be reduced to a formula or a checklist. This is particularly important because the characterization issue determines whether Article 9's perfection requirements apply. Applicability of those requirements will benefit other creditors, who are not parties to the contract. It is for this reason that the

---

[22] *In re Evergreen Valley Resort, Inc.,* 23 B.R. 659, 661 (Bankr. D. Me. 1982) (citations and internal quotation marks omitted).Contrary to Island Leasing's assertion, parol evidence is also admissible to show the true nature of the transaction because the Assignment was not an integrated statement of the parties' entire agreement. The parol evidence rule only applies to an agreement "set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms . . . ." Haw. Rev. Stat. § 490:2-202. I have found that the Assignment was not a final expression of the agreement between the Debtor and Island Leasing.

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 325   Filed 11/26/19   Page 29 of 39

substance rather than the form of the transaction governs: parties must not be permitted to "contract around" the rights of people, who are not parties to the contract but are nonetheless affected by it, having no ability to protect themselves.[23] Adopting a fixed formula or a rigid list of factors to decide the characterization question would make it easy for shrewd parties to draft an agreement fitting the formula and "contract around"the rights of innocent third parties.

I have found that, in substance, this transaction was a secured loan. Therefore, the IL Rotables and their proceeds were property of the Debtor and the payment of the proceeds to Island Leasing was a "transfer of [an] interest in property of the debtor" for purposes of section 547. Further, the transfer to Island Leasing was made on account of the Debtor's antecedent

_____

[23] The Ninth Circuit employed similar reasoning in *Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261 (9th Cir. 1993). The plaintiff contended that pawn transactions should be treated as loans subject to the Truth in Lending Act, even though some language in the relevant contract indicated that the transactions were sales. After notice that the contract was ambiguous, the court of appeals went on to hold that, "[b]ecause the Truth in Lending Act is liberally construed to protect consumers, the lack of this sort of ambiguity would not have prevented the court from looking past the form of the transactions to their economic substance in deciding whether the Act applied." *Id*. at 1262.

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 325   Filed  11/26/19   Page 30 of 39

debt of $800,000 to Island Leasing.

Even if the Assignment effected a sale as Island Leasing contends, the $400,000 payment to Island Leasing would still be a preference. Island Leasing agreed that the Debtor could keep the first $400,000 payment, even though the first shipment consisted mostly of IL Rotables, in exchange for the Debtor's promise to remit to Island Leasing the next payments. Thus, even assuming that Island Leasing owned the IL Rotables, Island Leasing became a creditor when it let the Debtor keep the proceeds of most of the IL Rotables in return for the Debtor's promise to make a payment in the future. When the Debtor remitted the second $400,000 payment to Island Leasing, it did so on account of an antecedent debt it owed to Island Leasing.

### 3. *Ordinary Course Defense*

Section 547(c)(2) provides that the trustee may not employ the preference power to avoid a transfer:

> to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 325   Filed   11/26/19   Page 31 of 39

transfer was–

> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or

> (B) made according to ordinary business terms . . . .[24]

The transferee has the burden of proving that this exception applies.[25]

Before trial,[26] Island Leasing argued in the alternative that, if the court decides that the transaction was a loan (as I have done), the "ordinary course" exception applies. Island Leasing contended that, when the Debtor experienced an earlier cash shortage in December 2015, the Debtor and Island Leasing entered into an almost identical transaction, except the spare parts were for Q-400 aircraft.

A first-time transaction can qualify for "ordinary course" treatment, in the right circumstances.[27] But Island Leasing bears the burden of proof,

---

[24] 11 U.S.C. § 547(c)(2).

[25] *Wood v. Stratos Prod. Dev., LLC (In re Ahaza Sys., Inc.)*, 482 F.3d 1118, 1128 (9th Cir. 2007).

[26] Island Leasing did not mention this argument in its trial brief or post-trial briefing, so has abandoned it. I discuss it anyway out of an abundance of caution.

[27] *Id*. at 1126.

and it failed to carry that burden. Island Leasing established, and the trustee did not dispute, that Island Leasing and the Debtor engaged in one similar previous transaction. But Island Leasing offered no other evidence that the transaction challenged in this adversary proceeding, made on the brink of the Debtor's bankruptcy filing and when both parties knew of the Debtor's extreme financial distress, was ordinary in any sense of that word.

### 4. *Contemporaneous Exchange Defense*

Before trial,[28] Island Leasing asserted the "contemporaneous exchange" defense of section 547(c)(1). That section precludes preference avoidance of a transfer "to the extent that such transfer was (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange."[29] Island Leasing argues that this defense could apply if (1) the underlying transaction was a sale, as Island Leasing contends, and (2) Island Leasing

---

[28] Island Leasing also omitted this argument from its trial brief and post-trial memoranda, and therefore has abandoned it.

[29] 11 U.S.C. § 547(c)(1).

33

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 325   Filed 11/26/19   Page 33 of 39

sold the IL Rotables back to the Debtor, so the Debtor could resell them to AAR.

I have found that the transaction was a loan and not a sale in substance. Therefore, Island Leasing did not transfer anything to the Debtor contemporaneously with the Debtor's payment of $400,000 to Island Leasing, and Island Leasing failed to prove that this defense applies.

Further, even if Island Leasing owned the IL Rotables, it became a creditor of the Debtor when it agreed to let the Debtor ship most of the IL Rotables to AAR and to keep AAR's first payment of $400,000 in return for the Debtor's promise to pay Island Leasing out of AAR's subsequent installments. The Debtor paid Island Leasing weeks after the parties made this arrangement. Therefore, even if Island Leasing owned the IL Rotables, the Debtor still made the $400,000 payment on account of an antecedent debt.

## B.    Entitlement to the Final $400,000 Installment

In count II of the complaint, the trustee seeks a declaratory judgment providing that Island Leasing did not have title to or a security interest in

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 325   Filed   11/26/19   Page 34 of 39

any of the ATR spare parts, and has no right to the remaining receivable due from AAR. For the reasons set out above, the trustee is entitled to that relief and she is entitled to receive the final $400,000 installment from AAR.

## C. Post-petition transfers

Count III of the complaint alleges that the last shipment of HIA spare parts occurred after the Debtor's bankruptcy petition was filed and that the trustee is entitled to avoid the transfer and recover the value of the transferred property from AAR and Island Leasing.

The trustee has settled all of her claims against AAR. The settlement agreement provides that, if the order approving the settlement is appealed, "the parties shall stipulate to sever and continue, but not dismiss, the Trustee's claims against AAR and AAR's counterclaims against the Trustee until the appeal has been determined."[30] Island Leasing has appealed the order approving the settlement, so the claims against AAR have not been dismissed. But the parties have agreed that this court should not decide those claims until after the appeal is resolved, so I will not do so.

---

[30] Dkt. 684 in Bk. No. 17-01078 at 9.

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 325   Filed   11/26/19   Page 35 of 39

Section 549(a) provides that, with certain exceptions that do not

apply here:

the trustee may avoid a transfer of property of the estate–

> (1)     that occurs after the commencement of the case; and

> (2)(A) that is authorized only under section 303(f) or
> 542(c) of this title; or

> (B) that is not authorized under this title or by the court.[31]

I have found that Island Leasing was not an "owner" of the IL

Rotables. Therefore, all of the ATR spare parts that were shipped to AAR

were property of the Debtor's bankruptcy estate.

I entered partial summary judgment on July 19, 2019, determining

that the October 16 shipment occurred after the commencement of the

Debtor's bankruptcy case.[32] There is no dispute that the November

shipments were also post-petition.

Neither section 303(f) nor section 542(c) applies.[33] Section 303(f) only

---

[31] 11 U.S.C. § 549(a).

[32] Dkt. No. 236.

[33]  11 U.S.C. §§ 303(f) and 547(c).

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 325   Filed   11/26/19   Page 36 of 39

applies to involuntary bankruptcy cases; the Debtor filed a voluntary petition. Section 542(c) protects transferors who lack notice and knowledge of the bankruptcy filing, but the Debtor was fully aware that it had filed a petition.

No one contests the fact that neither the Bankruptcy Code nor this court authorized the post-petition shipments to AAR.

Therefore, the shipments on and after October 16 are avoidable under section 549.

Section 550 provides that, "to the extent that a transfer is avoided under section . . . 549 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property . . . ." The trustee seeks recovery of the value of the HIA spare parts that were shipped post-petition. I find that recovery of the value of the property is the appropriate remedy in this case.

The Code does not define this value nor indicate the time at which such value should be determined. However, the purpose of section 550 is to restore the debtor "to the state it would have been had the transfer not

occurred."[34]  In order to restore the status quo, courts have typically determined that the measure of liability should be the "fair market value" of the transferred property, at the time of the transfer.[35] The trustee, in this case, bears the burden of establishing the fair market value of the property that was transferred post-petition.[36]

I find that the trustee did not carry her burden of proving, by a preponderance of the evidence, the value of the property that the Debtor transferred post-petition. The trustee does not seek recovery of those items themselves, and could not obtain that relief from Island Leasing because AAR, not Island Leasing, has them. Therefore, while the post-petition transfers are avoidable under section 549,[37] the recovery of the value of such transfers under section 550 fails.

_____

[34] *Decker v. Voisenat (In re Serrato)*, 214 B.R. 219, 232 (Bankr. W.D. Mich. 1997); *In re JTS Corp.*, 617 F.3d 1102, 1115 (9th Cir. 2010).

[35] *Hopkins v. Freedom Mortgage Corp. et al. (In re Lemmons)*, 604 B.R. 888, 894 (Bankr. D. Idaho 2019).

[36] *McCarthy v. Financial Freedom Senior Funding Corporation (In re Early),* 2008 WL 2073917, *9 (Bankr. Colo., May 12, 2008).

[37] Dkt. No. 236.

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 325   Filed  11/26/19   Page 38 of 39

## V.    CONCLUSION

The trustee is entitled to judgment against Island Leasing on Count I in the amount of $400,000. As to Count II, the trustee is entitled to a declaratory judgment that Island Leasing did not have title to or a perfected security interest in the IL Rotables and has no right to the remaining receivable due from AAR. Island Leasing is entitled to judgment on Count III.

**END OF ORDER**

U.S. Bankruptcy Court - Hawaii   #18-90007   Dkt # 325   Filed  11/26/19   Page 39 of 39